## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **U. S. COMMODITY FUTURES TRADING COMMISSION,**<br><br>        **Plaintiff,**<br><br>    **vs.**<br><br>**JEFFREY SLEMMER, SLEMMER ENTERPRISES LLC d/b/a BERKLEY HARD ASSET GROUP and BERKLEY HARD ASSETS, CHRISTIAN DORRIAN, DORRIAN ENTERPRISES, LLC d/b/a BERKLEY RARE DIAMONDS, ADAM ROTH, and ROTH INVESTMENT GROUP LLC d/b/a BERKLEY HARD ASSET GROUP,**<br><br>        **Defendants.** | **Civil Action No:**<br><br><br>**Jury Demand** |

## COMPLAINT FOR INJUNCTIVE AND OTHER EQUITABLE RELIEF AND CIVIL MONETARY PENALTIES UNDER THE COMMODITY EXCHANGE ACT

The U.S. Commodity Futures Trading Commission ("CFTC" or "Commission"), by and through its attorneys, alleges as follows:

### I.    INTRODUCTION

1.      Beginning in at least June 2012 and continuing through the present (the "relevant period"), Defendants Jeffrey Slemmer, Slemmer Enterprises LLC, Christian Dorrian, Dorrian Enterprises, LLC, Adam Roth, and Roth Investment Group LLC (collectively, "Defendants"), acting individually, in concert with each other, and through their officers, employees, and agents, operated a common enterprise to defraud others in connection with contracts of sale of commodities in interstate commerce.

2.      In carrying out the fraudulent scheme, Slemmer Enterprises LLC d/b/a Berkley Hard Asset Group and Berkley Hard Assets, Dorrian Enterprises, LLC d/b/a Berkley Rare Diamonds, and Roth Investment Group LLC d/b/a Berkley Hard Asset Group operated and functioned as a common enterprise (the "Berkley Enterprise") while engaging in the unlawful acts and practices alleged in this Complaint.

3.      Defendants have purported to sell physical commodities, including gold, silver, and palladium, to individuals located throughout the United States, including in this District ("customers").  Defendants offer and sell precious metals on both a leveraged, margined, or financed basis, in which customers provide a portion of the purchase price and Defendants purportedly extend credit for the remainder ("retail commodity transactions" or "financed transactions"), and on a fully-paid basis in which customers provide 100% of the purchase price.

4.      In the course of their solicitations, Defendants represent to customers that purchased metals are stored at a depository on the customers' behalf.  Defendants typically provide customers with purchase orders and account statements stating that customers have acquired and own specific amounts of precious metals.  In fact, with rare exceptions, customers who enter into retail commodity transactions with the Berkley Enterprise do not have metals allocated to them at a depository, do not receive title to any metals, and do not have metals stored on their behalf.  Instead, any such metals are held in accounts owned and controlled by Defendants, and what limited inventory of metals that Defendants maintained in the name of "Berkley Hard Assets" was never sufficient to cover Defendants' obligations to their customers.

5.      From July 20, 2012 through September 4, 2014, Defendants received at least $2,769,218 from at least sixty customers for the purchase of precious metals, but used only a small portion of those funds to purchase precious metals as promised.

6.      After soliciting customers into buying precious metals, Defendants, either through further solicitations or unilateral action, sell the metal, if any, and buy diamonds.  Defendants provide customers the diamonds through the mail, along with purchase orders and, in some instances, appraisal documents.  The purchase orders and appraisal documents are fraudulent and misrepresent any fair market or resale value of the diamonds.  This "bait-and-switch" from precious metals to diamonds is a manipulative or deceptive scheme devised and employed by Defendants to defraud customers, leaving customers with diamonds worth far less than what Defendants represent and only a small fraction of their original investment.

7.      By virtue of this conduct and the conduct further described herein, Defendants have engaged, are engaging, or are about to engage in conduct in violation of Sections 4(a), 4b(a)(2), 4d(a), and 6(c) of the Commodity Exchange Act (the "Act"), 7 U.S.C. §§ 6(a), 6(b)(a)(2), 6d(a), and 9(1) (2012), and Commission Regulation 180.1, 17 C.F.R. § 180.1 (2015).

8.      Unless restrained and enjoined by this Court, Defendants are likely to continue engaging in the acts and practices alleged in this Complaint or in similar acts and practices.

9.      Accordingly, pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1, the Commission brings this action to enjoin Defendants' unlawful acts and practices and to compel their compliance with the Act and the regulations promulgated thereunder.  In addition, the Commission seeks civil monetary penalties, restitution, rescission, disgorgement, and such other equitable relief as the Court may deem necessary or appropriate.

## II.      JURISDICTION AND VENUE

10.     This Court has jurisdiction over this matter pursuant to Section 6c(a) of the Act, 7 U.S.C. § 13a-1(a), which provides that whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in an act or practice constituting a

violation of any provision of the Act or any rule, regulation, or order thereunder, the Commission may bring an action in the proper district court of the United States to enjoin such act or practice or to enforce compliance.

11.     With respect to Defendants' retail commodity transactions, the Commission has jurisdiction over the conduct and transactions at issue pursuant to Section 2(c)(2)(D) of the Act, 7 U.S.C. § 2(c)(2)(D).

12.     With respect to Defendants' non-financed fully-paid transactions, the Commission has jurisdiction over the conduct and transactions at issue pursuant to Section 6(c)(1) of the Act, 7 U.S.C. § 9(1).

13.     Venue properly lies with this Court under both Section 6c(e) of the Act, 7 U.S.C. § 13a-1(e), because Defendants reside or transact business in this District and certain transactions, acts, practices, and business alleged in this Complaint occurred, are occurring, or are about to occur within this District.

### III.     THE PARTIES

14.     Plaintiff **U.S. Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with administering and enforcing the Act, 7 U.S.C. §§ 1 *et seq.*, and the Regulations promulgated thereunder, 17 C.F.R. §§ 1 *et seq*.

15.     Defendant **Jeffrey Slemmer** ("Slemmer") currently resides in Acton, Massachusetts; prior to the fall of 2015, Slemmer resided in Palm Beach, Florida.  During the relevant period, Slemmer owned and managed Slemmer Enterprises LLC ("Slemmer Enterprises").  Slemmer, acting alone or in concert with others, has formulated, directed, controlled, had the authority to control, and/or participated in the acts and practices of Slemmer Enterprises, including the acts and practices set forth in this Complaint.  Slemmer has never been registered with the Commission in any capacity.

16.     Defendant **Slemmer Enterprises LLC** ("Slemmer Enterprises") was a Florida limited liability company with its principal place of business in Boca Raton, Florida.  On or around October 30, 2012, Slemmer registered "Berkley Hard Assets" as a fictitious name of Slemmer Enterprises with the Florida Department of State, Division of Corporations (the "State of Florida").  The following month, Slemmer, on behalf of Slemmer Enterprises, registered the fictitious name of "Berkley Hard Asset Group" with the State of Florida.  Slemmer Enterprises has never been registered with the Commission in any capacity.

17.     Defendant **Christian Dorrian** ("Dorrian") resides in Boynton Beach, Florida. During the relevant period, Dorrian owned and managed Dorrian Enterprises, LLC ("Dorrian Enterprises").  Dorrian, acting alone or in concert with others, has formulated, directed, controlled, had the authority to control, and/or participated in the acts and practices of Dorrian Enterprises, including the acts and practices set forth in this Complaint.  Dorrian has never been registered with the Commission in any capacity.

18.     Defendant **Dorrian Enterprises, LLC** ("Dorrian Enterprises") was a Florida limited liability company with its principal place of business in Boca Raton, Florida.  In June 2012, Dorrian, on Dorrian Enterprises' behalf, registered "Sterling Fine Diamonds" as a fictitious name with the State of Florida.  On or around August 8, 2012, Dorrian, again on behalf of Dorrian Enterprises, registered "Berkley Rare Diamonds" as a fictitious name.  Dorrian Enterprises has never been registered with the Commission in any capacity.

19.     Defendant **Adam Roth** ("Roth") resides in Boca Raton, Florida.  During the relevant period, Roth owned and managed Roth Investment Group LLC ("Roth Investment Group").  Roth, acting alone or in concert with others, has formulated, directed, controlled, had the authority to control, and/or participated in the acts and practices of Roth Investment Group,

5

including the acts and practices set forth in this Complaint.  Roth has never been registered with the Commission in any capacity.

20.  Defendant **Roth Investment Group LLC** ("Roth Investment Group") was a Florida limited liability company with its principal place of business in Delray Beach, Florida. On or around June 25, 2012, Roth registered "Berkley Hard Asset Group" as a fictitious name of Roth Investment Group.  Roth Investment Group has never been registered with the Commission in any capacity.

21.  Slemmer Enterprises, Dorrian Enterprises, and Roth Investment Group have operated and functioned as a common enterprise—the Berkley Enterprise— while engaging in the unlawful acts and practices alleged in this Complaint.  These defendants conducted business through an interrelated network of companies that have common control, ownership, business functions, employees, agents, and office space.  Because these defendants have operated a common enterprise, they are jointly and severally liable for the unlawful acts and practices alleged in this Complaint.

## IV.   RELEVANT STATUTORY BACKGROUND

22.  Section 2(c)(2)(D)(i) of the Act, 7 U.S.C. § 2(c)(2)(D)(i), provides the Commission with jurisdiction, subject to certain exceptions, over "any agreement, contract, or transaction in any commodity" that is entered into with, or offered to, a person that is not an eligible contract participant ("ECP") "on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis" (the aforementioned "retail commodity transactions").  Pursuant to Section 2(c)(2)(D)(iii), 7 U.S.C. § 2(c)(2)(D)(iii), such retail commodity transactions are subject to Sections 4(a), 4(b), and 4b of the Act, 7 U.S.C. §§ 6(a), 6(b), 6b, as if they are a contract of sale

of a commodity for future delivery.  As a result, these transactions, commonly known as a

"futures contract," must be executed on an exchange and are subject to anti-fraud provisions as

set forth in Sections 4(a) and 4b of the Act, 7 U.S.C. §§ 6(a), 6b.

23.     The Act defines an ECP, in relevant part, as an individual who has amounts

invested on a discretionary basis, the aggregate of which exceeds $10 million, or $5 million if the

individual enters into the transaction to manage the risk associated with an asset owned or

liability incurred, or reasonably likely to be owned or incurred, by the individual.  7 U.S.C.

§ 1a(18)(xi).

24.     Section 4(a) of the Act, 7 U.S.C. § 6(a), in relevant part, makes it unlawful for any

person to offer to enter into, execute, confirm the execution of, or conduct any business

anywhere in the United States for the purpose of soliciting, accepting any order for, or otherwise

dealing in any transaction in, or in connection with, a contract for the purchase or sale of a

commodity for future delivery unless the transaction is conducted on or subject to the rules of a

board of trade that has been designated or registered by the Commission as a contract market.

25.     Section 4b(a)(2) of the Act, 7 U.S.C. § 6b(a)(2), in relevant part, makes it

unlawful for any person, in or in connection with any order to make, or the making of, any

contract of sale of any commodity for future delivery that is made, or to be made, for or on

behalf of, or with any other person, other than on or subject to the rules of a designated contract

market: (A) to cheat or defraud or attempt to cheat or defraud the other person; (B) willfully to

make or cause to be made to the other person any false report or statement, or willfully to enter

or cause to be entered for the other person any false record; or (C) willfully to deceive or attempt

to deceive the other person by any means whatsoever in regard to any order or contract or the

disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for, on behalf of, or with the other person.

26.     Section 4d(a)(1) of the Act, 7 U.S.C. § 6d(a)(1), makes it unlawful for any person to act as a futures commission merchant ("FCM") unless such person is registered with the Commission.  As defined in the Act, a "futures commission merchant" includes individuals or entities engaged in soliciting or accepting orders for a commodity for future delivery or for retail commodity transactions, as well as those who act as a counterparty in any retail commodity transaction.  7 U.S.C. § 1a(28)(A)(i)(I)(aa)(AA), (DD), and (bb).

27.     Section 6(c)(1) of the Act, 7 U.S.C. § 9(1), in relevant part, makes it unlawful for any person, directly or indirectly, to use or employ, in connection with a contract of sale of any commodity in interstate commerce, or for future delivery on or subject to the rules of any registered entity, any manipulative or deceptive device or contrivance, in contravention of Commission rules or regulations.

28.     Regulation 180.1(a), 17 C.F.R. § 180.1(a), in relevant part, makes it unlawful for any person, in connection with a contract of sale of any commodity in interstate commerce, or contract for future delivery on or subject to the rules of any registered entity, to intentionally or recklessly: (1) use or employ, or attempt to use or employ, any manipulative device, scheme, or artifice to defraud; (2) make, or attempt to make, any untrue or misleading statement of a material fact or to omit to state a material fact necessary in order to make the statements made not untrue or misleading; or (3) engage, or attempt to engage, in any act, practice, or course of business, which operates or would operate as a fraud or deceit upon any person.

## V.    FACTS

**A.    Defendants' Scheme to Defraud**

29.    Throughout the relevant period, Defendants, acting individually, in concert with each other, and with others under their employ, supervision, and control, engage in and have engaged in a fraudulent scheme to solicit customers throughout the United States for the purported purpose of investing in precious metals.  Defendants used only a portion of customer funds to ever purchase precious metals and Defendants misappropriated the rest.  Moreover, once they obtain the customers' funds, Defendants employ a "bait-and-switch" scheme to exchange the precious metals for diamonds worth far less than Defendants represent.  Defendants have made numerous misrepresentations in furtherance of this scheme, including false representations regarding the potential for profit and the value of the diamonds.

30.    Defendants have perpetrated this scheme through the Berkley Enterprise, which included entities known as Berkley Hard Asset Group or Berkley Hard Assets ("Berkley Hard Assets") and Berkley Rare Diamonds ("Berkley Rare Diamonds").  Each was a fictitious name registered by Slemmer, Dorrian, or Roth with the Florida Department of State, and each shared the same business address at 2701 NW 2nd Avenue, Boca Raton, Florida.

31.    During the relevant period, Slemmer Enterprises, Dorrian Enterprises, and Roth Investment Group did business in the name of, and solicited customers on behalf of, the Berkley Enterprise.  Specifically, Slemmer Enterprises and Roth Investment Group did business as Berkley Hard Asset Group or Berkley Hard Assets, while Dorrian Enterprises did business as Berkley Rare Diamonds.

32.    During the relevant period, Slemmer, Dorrian, and Roth, acting individually and on behalf of the Berkley Enterprise, advertised, marketed, and sold precious metals investments

and diamonds to customers.  Slemmer, Dorrian, and Roth did not distinguish between the

Berkley Enterprise entities when soliciting customers, and Slemmer, Dorrian and Roth each

acted on behalf of all members of the Berkley Enterprise.

33.     During the relevant period, Slemmer Enterprises maintained three bank accounts

in its own name d/b/a Berkley Hard Assets at JPMorgan Chase (the "Slemmer Accounts").

Slemmer was the sole authorized signatory on the Slemmer Accounts.  Slemmer, Roth, and

Dorrian all caused customer funds to be deposited into the Slemmer Accounts.

34.     During the relevant period, Roth Investment Group maintained two bank accounts

at JPMorgan Chase in its own name d/b/a Berkley Hard Asset Group (the "Roth Accounts").

Roth and Slemmer were both authorized signatories on the Roth Accounts.  Slemmer, Roth, and

Dorrian all caused customer funds to be deposited into the Roth Accounts.

35.     During the relevant period, Dorrian Enterprises maintained an account at TD

Bank in its own name d/b/a Sterling Precious Metals and, after August 2012, as Berkley Rare

Diamonds (the "Dorrian Account").  Dorrian was the sole signatory on the Dorrian Account.

Slemmer, Roth, and Dorrian all caused customer funds to be transferred from the Slemmer

Accounts and Roth Accounts into the Dorrian Account.

36.     From July 20, 2012 through September 4, 2014, the Berkley Enterprise

collectively received at least $2,769,218 of customer funds, which were deposited into and

flowed through the Slemmer Accounts, the Dorrian Account, and the Roth Accounts

(collectively, the "Berkley Accounts").

**B.     Precious Metals Solicitations**

37.     Slemmer, Dorrian, and Roth hold out Berkley Hard Assets as a trading firm

offering financed and fully-paid transactions in precious metals, as well as diamonds.  Through

at least May 2015, Defendants maintained a website for Berkley Hard Assets, *www.bhagroup.net* (the "website"), which was accessible to customers located throughout the United States, including in this District.

38.     Defendants' website identified Berkley Hard Assets as a "privately held investment firm" offering "a diverse array of tangible asset investment products, specializing in precious metals and fancy colored rare diamonds" and providing "clients" with "asset protection and physical wealth storage products."  It asserted that Berkley Hard Asset's "incomparable team of brokers has expertise in all facets of precious metal and fancy colored rare diamond investing and purchasing."  The website also boasted of gold's "sustained upward trend" and represented that "all financial indicators point to explosive growth in the silver market."

39.     Slemmer, Dorrian, Roth, and others acting on behalf of the Berkley Enterprise solicit customers and potential customers by telephone to invest in precious metals.  Defendants procure the names and contact information of potential customers by purchasing "leads lists," consisting primarily of senior citizens and retirees who have certain levels of income or assets or who have been previously solicited by telemarketing firms.  On occasion, Defendants use a service which enables them to disguise their voices and change the phone number that appears on the recipient's Caller ID.

40.     In telephone solicitations to customers and potential customers, Defendants misrepresent the experience and expertise of the "brokers," as well as the risk and profit potential of investments in precious metals.  Slemmer, Dorrian, Roth, and others soliciting on behalf of the Berkley Enterprise use high-pressure tactics to persuade customers to invest, often asserting that precious metals offer a safe alternative to other investments and predicting that precious metals would increase in value in the near future.  Contrary to these representations, the precious metals

market is volatile and future values cannot be reasonably predicted.  Defendants also fail to clearly disclose that, in light of the exorbitant fees and commissions charged to customers, precious metals would have to increase significantly in value just for the customers to break even on their investments.

       **C.**     **Account Agreements**

41.    Upon information and belief, all of Defendants' customers complete account opening documents which include a precious metals account agreement (the "Account Agreement").  At times, Defendants directed customers to the Berkley Hard Assets website to electronically sign account opening documents, including the Account Agreement.  In other instances, Defendants mail or fax copies of the Account Agreement to customers to execute. Defendants have utilized different versions of the Account Agreement during the relevant period.

42.    Through the website, telephone solicitations, and Account Agreement, Defendants represent to customers that Berkley Hard Assets is selling, and customers are purchasing, tangible, physical assets in the form of precious metals.  Defendants also represent that, for financed transactions, Berkley Hard Assets extends financing for the purchase of physical metals.

43.    The Account Agreement available on Defendants' website represents that Berkley Hard Assets will "endeavor to buy or sell on [the customer's] behalf certain precious metals bullion products including but not limited to coins, bars, bags of coins and other precious metals commitments, holdings, exchange contracts and exchange receipts[.]"  At least certain versions of the Account Agreement identify, by ounce and purity, the types of bullion, ingots, and coins offered by Berkley Hard Assets.

44.    The Account Agreement provides that Berkley Hard Assets will execute customer transactions at a price per ounce determined by Berkley Hard Assets in accordance with

undisclosed "industry standards"; and at least one version of the agreement states that Berkley Hard Assets' prices "are not tied to prices quoted by any other organization" and subject to change at any time upon its sole discretion.

45.     With respect to financed transactions, the Account Agreement states that Berkley Hard Assets will extend financing and charge customers "a variable rate over the prime rate . . . [that would] not exceed the prime rate by more than 7% per annum."  However, the agreement further states that Berkley Hard Assets reserves the right to change the interest rate at any time.

46.     Defendants also charge customers account opening fees, commissions or management fees, shipping and handling fees, as well as service and storage fees.  Like the price per ounce and financing rates, Berkley Hard Assets reserved the right to change all of these fees at any time and in its sole discretion.

47.     Because of the exorbitant fees charged by Berkley Hard Assets, which run as high as 25% of the customer's investment contribution, precious metals would have to increase significantly in value for customers to break even on their investments, and even more for customers to receive any profit on their investment.  Customers' ability to break even on their investments is further hampered by Berkley Hard Assets' bid/ask spread between the prices at which Berkley Hard Assets permits customers to buy and sell precious metals, which historically ranged from 1.5% to 6%, but is subject to change at any time and at Defendants' sole discretion.

48.     The Account Agreement provided to at least some customers falsely represents that "transactions with [Berkley Hard Assets] involve delivery within at most 28 days of the date of purchase . . . As a result they are not regulated by the Commodity Futures Trading Commission or the National Futures Association."  It further misrepresents that, upon receipt of "good funds" from the customer, Berkley Hard Assets will deliver precious metals to the

customer, the customer's appointed agent, or "for the benefit of [the customer] to a depository used by [Berkley Hard Assets] for the purpose of safekeeping precious metals[.]"  With respect to precious metals delivered to a depository, the Account Agreement states that the customer "acquires title to an undivided share" of a fungible lot "held in safekeeping on a fungible basis with the precious metals of other customers."

### D.   Failure to Purchase and Deliver Precious Metals

49.   With rare exceptions, Defendants do not provide customers with actual, physical possession of precious metals.  Defendants falsely represent that the precious metals purchased by customers, whether fully paid or financed, are acquired and stored by Defendants at a depository.  In reality, Defendants fail to purchase and store sufficient precious metals to satisfy their obligations to customers, and, with limited exception, fail to store metal in the name of or on behalf of their customers.

50.   With the limited exception of a few customers who invested through IRA accounts, Defendants do not maintain segregated accounts in the name of individual customers at a depository.  While Defendants briefly stored a limited amount of precious metals in Berkley Hard Assets' name at a depository, this inventory was far less than the aggregate amount Defendants claimed to have purchased for their non-IRA customers.  Moreover, at no point during the relevant time did these non-IRA customers have title to or control over any precious metals that Defendants purchased, and these customers had no recourse against any depository holding precious metals in Defendants' names.

51.   Instead of purchasing precious metals as promised, Defendants misappropriated customer funds for other purposes, including for their personal benefit.

14

52.     Notwithstanding their failure to properly acquire precious metals with customer funds, Defendants provide customers with trade confirmations and periodic account statements falsely representing that customers own a specified amount of precious metals purchased at a particular price.  Defendants also charge customers storage fees and financing charges as if the full amount of precious metals has in fact been purchased and stored.

    **E.**    **Defendants Engage in a Bait-and-Switch, Transferring Customers from Precious Metals to Diamonds**

53.     After soliciting customers to invest in precious metals and receiving their funds, Slemmer, Dorrian, Roth, and others acting on behalf of the Berkley Enterprise contact customers by telephone and urge them to invest in diamonds instead.  Typically, Defendants tell customers that diamonds offer a better investment opportunity than precious metals.  In at least some instances, Defendants also represent that they obtained diamonds at a discounted price, and are offering a special deal to their customers.

54.     When customers do not immediately agree to sell their precious metals and buy diamonds, Defendants continue calling until the customers agrees to purchase the diamonds offered by Defendants.  In some instances, customers have refused Defendants' solicitations, but Defendants nevertheless shifted their investments to diamonds.

55.     By U.S. mail, FedEx, or other carrier, Defendants provide customers with diamonds as well as purchase orders and sometimes appraisals for the diamonds that fraudulently misrepresent any fair market value or resale value of the diamonds.

56.     The purchase orders, generated on the letterhead of Berkley Hard Assets or Berkley Rare Diamonds, include "unit prices" that bear no relationship to any fair market or resale value of the diamonds.  Defendants do not purchase diamonds for the prices shown on the purchase orders, and Defendants do not offer to repurchase diamonds from their customers at or

near the prices shown on the purchase orders.  Defendants know or should know that the "unit prices" do not reflect the diamonds' fair market or resale value.  By falsely representing the value of diamonds sold to their customers, Defendants are knowingly defrauding customers by selling diamonds at multiples of their actual value.

57.     Defendants also obtain and provide some customers with appraisals that grossly overstate the value of the respective diamonds and represent that values for such diamonds "are constantly increasing."  Defendants provided one customer with four diamonds and "appraisals" showing a total "retail value" of $98,000 for the diamonds.  An independent certified appraiser subsequently estimated the fair market value of the diamonds to be only $12,100.

58.     Contrary to Defendants' representations, the diamonds provided to customers are of low quality and worth far less than Defendants claim.

## VI.     VIOLATIONS OF THE COMMODITY EXCHANGE ACT

### COUNT ONE

**Violations of Section 6(c)(1) of the Act and Regulation 180.1(a):
Deceptive Devices or Contrivances**

59.     Paragraphs 1 through 58 are re-alleged and incorporated herein.

60.     During the relevant period, Defendants used or employed manipulative or deceptive devices or contrivances in connection with contracts of sale of commodities in interstate commerce, including, but not limited to:

    a.  Misrepresenting the risk, cost, and profit potential of the precious metals investments offered to customers;

    b.  Misrepresenting their investment experience and expertise;

    c.  Misrepresenting that customers acquired allocated, physical metal, when in fact Defendants failed to purchase or store metal on customers' behalf;

    d.  Preparing and issuing trade confirmations and account statements that misrepresented customers' ownership of precious metals and/or the value of customers' precious metals holdings;

   e.   Engaging in a bait-and-switch ruse that involved soliciting customers into precious metals investments, misrepresenting the value of the precious metals accounts, and then convincing customers to divest their metals holdings and acquire diamonds fraudulently overvalued by Defendants;

   f.   Misrepresenting the value of diamonds provided to customers by, among other things, providing appraisals that vastly overvalued the diamonds; and/or

   g.   Misappropriating customer funds provided for the purchase of precious metals.

61.    Defendants knowingly or recklessly engaged in the foregoing conduct.

62.    Through the foregoing conduct, Defendants violated Section 6(c) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3).

63.    Each member of the Berkley Enterprise participated in the unlawful acts and practices described in this Complaint and are therefore jointly and severally liable for the violations of Section 6(c) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3) committed by other members of the Berkley Enterprise.

64.    The acts, omissions, and failures of Slemmer, Dorrian, and Roth, and other officers, employees, or agents acting for Slemmer Enterprises described in this Complaint occurred within the scope of their employment, agency, or office, and are deemed to be the acts, omissions, and failures of Slemmer Enterprises by operation of Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.

65.    The acts, omissions, and failures of Slemmer, Dorrian, and Roth, and other officers, employees, or agents acting for Dorrian Enterprises described in this Complaint occurred within the scope of their employment, agency, or office, and are deemed to be the acts, omissions, and failures of Dorrian Enterprises by operation of Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.

66.    The acts, omissions, and failures of Slemmer, Dorrian, and Roth, and other officers, employees, or agents acting for Roth Investment Group described in this Complaint

occurred within the scope of their employment, agency, or office, and are deemed to be the acts, omissions, and failures of Roth Investment Group by operation of Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.

67.     Slemmer controlled Slemmer Enterprises throughout the relevant period and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting the violations of Slemmer Enterprises described in this Count.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Slemmer is liable as a controlling person for those violations of Section 6(c) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3).

68.     Dorrian controlled Dorrian Enterprises throughout the relevant period and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting the violations of Dorrian Enterprises described in this Count.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Dorrian is liable as a controlling person for those violations of Section 6(c) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3).

69.     Roth controlled Roth Investment Group throughout the relevant period and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting the violations of Roth Investment Group described in this Count.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Roth is liable as a controlling person for those violations of Section 6(c) of the Act, 7 U.S.C. § 9(1), and Regulation 180.1(a)(1)-(3), 17 C.F.R. § 180.1(a)(1)-(3).

70.     Each act of (1) using or employing, or attempting to use or employ, a manipulative device, scheme, or artifice to defraud; (2) making, or attempting to make, untrue or misleading statements of material fact, or omitting to state material facts necessary to make the statements not untrue or misleading; and (3) engaging, or attempting to engage, in a fraudulent or deceitful act, practice, or a course of business, including, but not limited to, those specifically

alleged herein, is alleged as a separate and distinct violation of Section 6(c) of the Act, 7 U.S.C.

§ 9(1), and Regulation 180.1, 17 C.F.R. § 180.1(a)(1)-(3).

## COUNT TWO

### Violations of Sections 4b(a)(2)(A) and (C) of the Act:
### Fraud by Material Misrepresentations and Omissions and Misappropriation
### in Connection with Financed Transactions

71.    Paragraphs 1 through 58 are re-alleged and incorporated herein.

72.    Pursuant to Section 2(c)(2)(D)(iii) of the Act, 7 U.S.C. § 2(c)(2)(D)(iii), the retail

commodity transactions engaged in by Defendants are subject to Section 4b of the Act, 7 U.S.C.

§ 6b, as if they are contracts of sale of a commodity for future delivery.

73.    During the relevant period, Defendants, intentionally or with reckless disregard

for the truth, have (1) cheated or defrauded, or attempted to cheat or defraud, other persons,

and/or (2) willfully deceived or attempted to deceive other persons, and done so in or in

connection with retail commodity transactions.  Defendants did so by, among other things:

   a. Misrepresenting the risk, cost, and profit potential of the precious metals
      investments offered to customers on financed basis;

   b. Failing to adequately disclose the total fees and commissions charged to
      customers, and the effect such fees and commissions will have on customers'
      ability to earn a profit;

   c. Misrepresenting that the Defendants extended financing for precious metals
      investments;

   d. Misrepresenting that customers acquired physical metal when in fact Defendants
      failed to purchase or store metal on customers' behalf;

   e. Preparing and issuing trade confirmations and account statements that
      misrepresented customers' ownership of precious metals and the value of
      customers' precious metals holdings;

   f. Engaging in a bait-and-switch ruse that involved soliciting customers into
      precious metals investments, misrepresenting the value of the precious metals
      accounts, and then convincing customers to divest their metals holdings and
      acquire diamonds fraudulently overvalued by Defendants; and/or

19

g.   Misappropriating customer funds provided for the purchase of precious metals.

74.     Through the foregoing conduct, Defendants violated Section 4b(a)(2)(A) and (C) of the Act, 7 U.S.C. § 6b(a)(2)(A) and (C).

75.     Each member of the Berkley Enterprise participated in the unlawful acts and practices described in this Complaint and are therefore jointly and severally liable for the violations of Section 4b(a)(2)(A) and (C) of the Act, 7 U.S.C. § 6b(a)(2)(A) and (C), committed by other members of the Berkley Enterprise.

76.      The acts, omissions, and failures of Slemmer, Dorrian, and Roth, and other officers, employees, or agents acting for Slemmer Enterprises described in this Complaint occurred within the scope of their employment, agency, or office, and are deemed to be the acts, omissions, and failures of Slemmer Enterprises by operation of Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.

77.     The acts, omissions, and failures of Slemmer, Dorrian, and Roth, and other officers, employees, or agents acting for Dorrian Enterprises described in this Complaint occurred within the scope of their employment, agency, or office, and are deemed to be the acts, omissions, and failures of Dorrian Enterprises by operation of Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.

78.     The acts, omissions, and failures of Slemmer, Dorrian, and Roth, and other officers, employees, or agents acting for Roth Investment Group described in this Complaint occurred within the scope of their employment, agency, or office, and are deemed to be the acts, omissions, and failures of Roth Investment Group by operation of Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.

79.     Slemmer controlled Slemmer Enterprises throughout the relevant period and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting the

violations of Slemmer Enterprises described in this Count.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Slemmer is liable as a controlling person for those violations of Section 4b(a)(2)(A) and (C) of the Act, 7 U.S.C. § 6b(a)(2)(A) and (C).

80.     Dorrian controlled Dorrian Enterprises throughout the relevant period and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting the violations of Dorrian Enterprises described in this Count.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Dorrian is liable as a controlling person for those violations of Section 4b(a)(2)(A) and (C) of the Act, 7 U.S.C. § 6b(a)(2)(A) and (C).

81.     Roth controlled Roth Investment Group throughout the relevant period and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting the violations of Roth Investment Group described in this Count.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Roth is liable as a controlling person for those violations of Section 4b(a)(2)(A) and (C) of the Act, 7 U.S.C. § 6b(a)(2)(A) and (C).

82.     Each act of misrepresentation, omission, or misappropriation, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of Section 4b(a)(2)(A) and (C) of the Act, 7 U.S.C. § 6b(a)(2)(A) and (C).

## COUNT THREE

**Violations of Section 4b(a)(2)(B) of the Act:
Fraud by False Statements
in Connection with Financed Transactions**

83.     Paragraphs 1 through 58 are re-alleged and incorporated herein.

84.     During the relevant period, Defendants have willfully made or caused to be made to customers false reports or statements.  Defendants made these false statements in or in connection with retail commodity transactions.  Pursuant to Section 2(c)(2)(D)(iii) of the Act, 7

U.S.C. § 2(c)(2)(D)(iii), retail commodity transactions are subject to Section 4b of the Act, 7 U.S.C. § 6b, as if they are contracts of sale of a commodity for future delivery.

85.     Among other things, Defendants prepared and issued to customers who purchased precious metals through financed transactions trade confirmations and account statements that misrepresented customers' ownership of precious metals and the value of customers' precious metals holdings.

86.     Through the foregoing conduct, Defendants violated Section 4b(a)(2)(B) of the Act, 7 U.S.C. § 6b(a)(2)(B).

87.     Each member of the Berkley Enterprise participated in the unlawful acts and practices described in this Complaint and are therefore jointly and severally liable for the violations of Section 4b(a)(2)(B) of the Act, 7 U.S.C. § 6b(a)(2)(B), committed by other members of the Berkley Enterprise.

88.      The acts, omissions, and failures of Slemmer, Dorrian, and Roth, and other officers, employees, or agents acting for Slemmer Enterprises described in this Complaint occurred within the scope of their employment, agency, or office, and are deemed to be the acts, omissions, and failures of Slemmer Enterprises by operation of Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.

89.     The acts, omissions, and failures of Slemmer, Dorrian, and Roth, and other officers, employees, or agents acting for Dorrian Enterprises described in this Complaint occurred within the scope of their employment, agency, or office, and are deemed to be the acts, omissions, and failures of Dorrian Enterprises by operation of Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.

90.     The acts, omissions, and failures of Slemmer, Dorrian, and Roth, and other officers, employees, or agents acting for Roth Investment Group described in this Complaint occurred within the scope of their employment, agency, or office, and are deemed to be the acts, omissions, and failures of Roth Investment Group by operation of Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.

91.     Slemmer controlled Slemmer Enterprises throughout the relevant period and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting the violations of Slemmer Enterprises described in this Count.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Slemmer is liable as a controlling person for those violations of Section 4b(a)(2)(B) of the Act, 7 U.S.C. § 6b(a)(2)(B).

92.     Dorrian controlled Dorrian Enterprises throughout the relevant period and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting the violations of Dorrian Enterprises described in this Count.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Dorrian is liable as a controlling person for those violations of Section 4b(a)(2)(B) of the Act, 7 U.S.C. § 6b(a)(2)(B).

93.     Roth controlled Roth Investment Group throughout the relevant period and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting the violations of Roth Investment Group described in this Count.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Roth is liable as a controlling person for those violations of Section 4b(a)(2)(B) of the Act, 7 U.S.C. § 6b(a)(2)(B).

94.     Each false statement or report, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of Section 4b(a)(2)(B) of the Act, 7 U.S.C. § 6b(a)(2)(B).

## COUNT FOUR

### Violations of Section 4(a) of the Act:
### Illegal Off-Exchange Financed Transactions

95.     Paragraphs 1 through 58 are re-alleged and incorporated herein.

96.     During the relevant period, Defendants have offered to enter into, entered into, executed, confirmed, or conducted an office or business in the United States for the purpose of soliciting, accepting orders for, or otherwise dealing in agreements, contracts, or transactions in commodities on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis, with persons who are not ECPs or eligible commercial entities as defined by the Act, and who are not engaged in a line of business related to precious metals.

97.     Pursuant to Section 2(c)(2)(D)(iii) of the Act, 7 U.S.C. § 2(c)(2)(D)(iii), the retail commodity transactions are subject to Section 4(a) of the Act, 7 U.S.C. § 6(a), as if they are contracts of sale of a commodity for future delivery.

98.     Defendants' retail commodity transactions are not, and were not, made or conducted on, or subject to, the rules of any board of trade, exchange, or contract market.

99.     Defendants therefore violated Section 4(a) of the Act, 7 U.S.C. § 6(a), by offering to enter into, entering into, executing, confirming the execution of, or conducting any office or business anywhere in the United States for the purpose of soliciting, accepting any order for, or otherwise dealing in any transaction in, or in connection with, retail commodity transactions, other than on or subject to the rules of a board of trade that has been designated or registered by the Commission as a contract market.

100.     Each member of the Berkley Enterprise participated in the unlawful acts and practices described in this Complaint and are therefore jointly and severally liable for the

violations of Section 4(a) of the Act, 7 U.S.C. § 6(a), committed by other members of the Berkley Enterprise.

101.    The acts, omissions, and failures of Slemmer, Dorrian, and Roth, and other officers, employees, or agents acting for Slemmer Enterprises described in this Complaint occurred within the scope of their employment, agency, or office, and are deemed to be the acts, omissions, and failures of Slemmer Enterprises by operation of Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.

102.    The acts, omissions, and failures of Slemmer, Dorrian, and Roth, and other officers, employees, or agents acting for Dorrian Enterprises described in this Complaint occurred within the scope of their employment, agency, or office, and are deemed to be the acts, omissions, and failures of Dorrian Enterprises by operation of Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.

103.    The acts, omissions, and failures of Slemmer, Dorrian, and Roth, and other officers, employees, or agents acting for Roth Investment Group described in this Complaint occurred within the scope of their employment, agency, or office, and are deemed to be the acts, omissions, and failures of Roth Investment Group by operation of Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.

104.    Slemmer controlled Slemmer Enterprises throughout the relevant period and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting the violations of Slemmer Enterprises described in this Count.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Slemmer is liable as a controlling person for those violations of Section 4(a) of the Act, 7 U.S.C. § 6(a).

105.     Dorrian controlled Dorrian Enterprises throughout the relevant period and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting the violations of Dorrian Enterprises described in this Count.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Dorrian is liable as a controlling person for those violations of Section 4(a) of the Act, 7 U.S.C. § 6(a).

106.     Roth controlled Roth Investment Group throughout the relevant period and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting the violations of Roth Investment Group described in this Count.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Roth is liable as a controlling person for those violations of Section 4(a) of the Act, 7 U.S.C. § 6(a).

107.     Each act of offering to enter into, entering into, executing, confirming, or conducting an office or business in the United States for the purpose of soliciting, accepting orders for, or otherwise dealing in unlawful retail commodity transactions, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation of Section 4(a) of the Act, 7 U.S.C. § 6(a).

## <u>COUNT FIVE</u>

### Violations of Section 4d(a) of the Act:
### Failure to Register as FCM

108.     Paragraphs 1 through 58 are re-alleged and incorporated herein.

109.     Section 4d of the Act, 7 U.S.C. § 6d, provides that it shall be unlawful for any person or entity to be a futures commission merchant unless such person or entity has registered with the Commission in that capacity.

110.     During the relevant period, Slemmer Enterprises and Roth Investment Group, while doing business as Berkley Hard Asset Group or Berkley Hard Assets, acted as FCMs by

26

soliciting and accepting orders for retail commodity transactions and by accepting customer funds. Slemmer Enterprises and Roth Investment Group failed to register with the Commission as FCMs, and therefore violated Section 4d of the Act, 7 U.S.C. § 6d.

111.    Each member of the Berkley Enterprise participated in the unlawful acts and practices described in this Complaint and are therefore jointly and severally liable for the violations of Section 4d of the Act, 7 U.S.C. § 6d, committed by other members of the Berkley Enterprise.

112.    The acts, omissions, and failures of Slemmer, Dorrian, and Roth, and other officers, employees, or agents acting for Slemmer Enterprises described in this Complaint occurred within the scope of their employment, agency, or office, and are deemed to be the acts, omissions, and failures of Slemmer Enterprises by operation of Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.

113.    The acts, omissions, and failures of Slemmer, Dorrian, and Roth, and other officers, employees, or agents acting for Dorrian Enterprises described in this Complaint occurred within the scope of their employment, agency, or office, and are deemed to be the acts, omissions, and failures of Dorrian Enterprises by operation of Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.

114.    The acts, omissions, and failures of Slemmer, Dorrian, and Roth, and other officers, employees, or agents acting for Roth Investment Group described in this Complaint occurred within the scope of their employment, agency, or office, and are deemed to be the acts, omissions, and failures of Roth Investment Group by operation of Section 2(a)(1)(B) of the Act, 7 U.S.C. § 2(a)(1)(B), and Regulation 1.2, 17 C.F.R. § 1.2.

115.    Slemmer controlled Slemmer Enterprises throughout the relevant period and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting the violations of Slemmer Enterprises described in this Count.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Slemmer is liable as a controlling person for those violations of Section 4d of the Act, 7 U.S.C. § 6d

116.    Dorrian controlled Dorrian Enterprises throughout the relevant period and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting the violations of Dorrian Enterprises described in this Count.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Dorrian is liable as a controlling person for those violations of Section 4d of the Act, 7 U.S.C. § 6d.

117.    Roth controlled Roth Investment Group throughout the relevant period and did not act in good faith, or knowingly induced, directly or indirectly, the acts constituting the violations of Roth Investment Group described in this Count.  Pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), Roth is liable as a controlling person for those violations of Section 4d of the Act, 7 U.S.C. § 6d.

118.    Each and every act in violation of Section 4d of the Act, 7 U.S.C. § 6d, including, but not limited to, those specifically alleged herein, is alleged as a separate and distinct violation.

## VII.    RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that this Court, as authorized by Section 6c of the Act, 7 U.S.C. § 13a-1 (2012), and pursuant to its own equitable powers:

A.    Enter an order finding all Defendants liable for violating Sections 4(a), 4b(a)(2), 4d(a), and 6(c) of the Act, 7 U.S.C. §§ 6(a), 6(b)(a)(2), 6d(a), and 9(1), and Commission Regulation 180.1, 17 C.F.R. § 180.1;

B.    Enter an order of permanent injunction prohibiting Defendants and any other

person or entity associated with them, including successors thereof, from:

1.    Engaging in conduct in violation of Sections 4(a), 4b(a)(2), 4d(a), and 6(c)(1) of the Act, 7 U.S.C. §§ 6(a), 6(b)(a)(2), 6d(a), and 9(1), and Commission Regulation 180.1, 17 C.F.R. § 180.1;

2.    Trading on or subject to the rules of any registered entity (as that term is defined in Section 1a(29) of the Act, 7 U.S.C. § 1a(29));

3.    Entering into any transactions involving "commodity interests" (as that term is defined in regulation 1.3(yy), 17 C.F.R. § 1.3(yy)), for accounts held in the name of any Defendant or for accounts in which any Defendant has a direct or indirect interest;

4.    Having any commodity interests traded on any Defendants' behalf;

5.    Controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

6.    Soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

7.    Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9); and

8.    Acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a)), agent, or any other officer or employee of any person registered, exempted from registration or required to be registered with the CFTC except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9).

C.    An order requiring each Defendant to pay civil monetary penalties under the Act,

to be assessed by the Court, in amounts of not more than the higher of (1) triple the monetary

gain for each violation of the Act; or (2) $140,000 for each violation of the Act and Commission

Regulations;

D.    An order directing Defendants, and any successors thereof, to disgorge pursuant

to such procedure as the Court may order, all benefits received including, but not limited to,

trading profits, revenues, salaries, commissions, fees or loans derived directly or indirectly from acts or practices which constitute violations of the Act and Commission Regulations as described herein, including pre-judgment interest thereon from the date of such violations;

E.  An order directing Defendants, and any successors thereof, to make full restitution to every customer, client, or investor whose funds were received by them as a result of acts and practices which constituted violations of the Act and Regulations, as described herein, and interest thereon from the date of such violations;

F.  An order directing that Defendants, and any successors thereof, make an accounting to the Court of all of their assets and liabilities, together with all funds they received from and paid to clients and other persons in connection with commodity transactions and all disbursements for any purpose whatsoever of funds received from commodity transactions, including salaries, commissions, interest, fees, loans and other disbursement of money or property of any kind from at least June 2012 to the date of such accounting.

G.  An order requiring Defendants to pay costs and fees as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2); and

H.  An order providing such other and further relief as this Court may deem necessary and appropriate under the circumstances.

Date:  May 31, 2016                              Respectfully submitted,

                                                 /s/ Daniel R. Burstein
                                                 Daniel R. Burstein (A5502201)
                                                 Elizabeth Pendleton (A550193)
                                                 David Terrell
                                                 Scott Williamson
                                                 Rosemary Hollinger (A5500849)
                                                 U.S. COMMODITY FUTURES TRADING
                                                 COMMISSION
                                                 525 W. Monroe Street, Suite 1100
                                                 Chicago, IL 60661
                                                 *dburstein@cftc.gov*
                                                 *ependleton@cftc.gov*
                                                 *dterrell@cftc.gov*
                                                 *swilliamson@cftc.gov*
                                                 *rhollinger@cftc.gov*
                                                 (312) 596-0697 (Burstein)
                                                 (312) 596-0629 (Pendleton)
                                                 (312) 596-0539 (Terrell)
                                                 (312) 596-0520 (Williamson)
                                                 (312) 596-0520 (Hollinger)
                                                 (312) 596-0714 (facsimile)